RECEIVED

JUN 0 9 2026

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| State of Minnesota, | Hennepin County, Fourth Judicial District Court File No. 27-CR-26-9656 |
| Plaintiff, | **NOTICE OF REMOVAL OF STATE CRIMINAL PROSECUTION PURSUANT TO 28 U.S.C. §§ 1442 and 1455** |
| v. | |
| Gregory Donnell Morgan, Jr., | |
| Defendant. | |

## NOTICE OF REMOVAL OF STATE CRIMINAL PROSECUTION & REQUEST FOR EVIDENTIARY HEARING

Defendant Gregory Donnell Morgan Jr., a Special Agent with the United States Immigration and Customs Enforcement, Enforcement and Removal Operations ("ICE/ERO"), through counsel, and pursuant to 28 U.S.C. §§ 1442 and 1455, files this Notice of Removal of State Criminal Prosecution ("Notice") to remove the case of *State v. Gregory Donnell Morgan Jr.*, Case No. 27-CR-26-9656 from the Hennepin County District Court, Fourth Judicial District, to the United States District Court for the District of Minnesota.

SCANNED
JUN 0 9 2026
U.S. DISTRICT COURT MPLS

1

This Notice is filed on June 9, 2026, which is within 30 days after Defendant's arraignment on May 22, 2026, and before any trial setting, and therefore is timely under 28 U.S.C. § 1455(b)(1).

While on duty and following an order to extract himself, his ICE agent partner, and his ICE team from a hostile neighborhood, and to safely regroup with his team and protect each other while operating, Agent Morgan followed orders and drove toward the Minnesota Air Force Reserve base to regroup in a safe place with his team where they continued their operational duties for an additional 2 hours. While driving, and with his partner seated in the middle row, Agent Morgan and his partner were put in fear of immediate bodily harm by a Cadillac sedan that intentionally swerved in front of them twice,[1] nearly causing Agent Morgan and his partner to be in a rear end collision or be run off the road. The Cadillac driver did this without any provocation from Agent Morgan. Fearing for his and his ICE partner's safety, as well as the safety of nearby motorists, Agent Morgan brandished[2] his service weapon and yelled "Police, Stop, back off!" The State has charged Agent Morgan with two counts of Assault in the Second Degree — Dangerous Weapon. Because he was acting in his official

---

[1] Agent Morgan turned out to be driving on the shoulder of eastbound highway 62, and the driver of the Cadillac claims he/she was upset Morgan was driving on the shoulder.

[2] The two occupants of the Cadillac allege that Morgan *pointed* his service weapon at them. The County Attorney has redacted all identifying information for those occupants in discovery, and obtained an Ex Parte order from the Hennepin County district court permitting this. This has hindered the defense investigation.

2

capacity and raises the defense that his actions were necessary and proper, he is entitled to have his case heard in federal court.

Pursuant to 28 U.S.C. § 1455(a), copies of all process, pleadings, and orders served upon Agent Morgan are attached as Exhibits A-H. (A) the criminal complaint and warrant filed April 16, 2026; (B) Certificate of Representation; (C) Defendant's Rule 9.01 Discovery Demand; (D) Bond; (E) Notice of Hearing and Judicial Assignment; (F) Conditional Release Order; (G) Waiver of Extradition hearing; (H) Register of Actions.  Defendant verifies that, to the best of his knowledge, these constitute all materials served in the state prosecution to date.  As grounds for removal, Agent Morgan states the following:

## BACKGROUND

Agent Morgan has been a sworn federal law enforcement agent since September, 2025, employed by U.S. Immigration and Customs Enforcement, a component of the department of Homeland Security, as an ICE/ERO Special Agent/Officer. He is based in the Washington D.C. area, but, as discussed below, was detailed to the Twin Cities metro area for the second wave of operation Metro Surge in February, 2026. He is and was unambiguously an "officer of the United States or agency thereof" within the meaning of 28 U.S.C. § 1442(a)(1).

As operation Metro Surge built up from December, 2025 through February, 2026, community resistance and hostility towards Federal law

3

enforcement agents increased. Citizens organized rapid-response networks. Many citizens were hostile to the presence of unmarked federal vehicles and undercover ICE agents conducting random street stops. Locals crowdsourced identifying information—such as unmarked federal law enforcement vehicle makes, models, and license plate numbers, sharing these details across social media and encrypted applications to track ICE movements, warn neighbors, and sometimes harass, threaten or assault ICE agents. The community was in a frenzy over operation Metro Surge, and community hostility grew as there were three shootings in the Twin Cities metropolitan area involving federal agents all in January, 2026.

On arriving to Minnesota late January, 2026, Agent Morgan and his team were briefed regarding the dangers posed to ICE agents by some hostile civilians. These included but were not limited to civilians using their vehicles to obstruct or assault ICE agents, throwing rocks and objects at ICE agents, cutting their tires, breaking their vehicle windows, among other actions.

On February 5, 2026, multiple ICE agents, including Agent Morgan and his ICE/ERO team were conducting a federal enforcement operation in Twin Cities neighborhoods. This operation included a combination of surveillance as well as support to other ICE officers as they came under harassment and threats of assaultive behavior from some citizens. The team had encountered significant

4

hostility during their operations each day, including February 5, 2026. The threats to Agent Morgan as well as other ICE officers included hostile people surrounding and following their vehicles throughout their deployment, making verbal threats of assault at them, throwing rocks, dildos, and other objects at them, calling them "niggers" and obstructing their operations on foot and in vehicles. Earlier that day, a Jeep Cherokee had dangerously swerved at Agent Morgan and his partner, causing both of them fear of imminent bodily harm.

As a result of the escalating danger to the ICE agents in the neighborhood, Agent Morgan's team's supervisor issued a direct order to the team to withdraw from the operational area because it was getting too dangerous for the ICE officers, and to protect each other and to regroup at the Minnesota Air Force Reserve base where they would get further instructions and continue their work. Agent Morgan as driver, with his partner accompanying him, began to extract from the neighborhood. Their vehicle got caught at a red light during the extraction, and they lost the rest of their team ahead of them. Agent Morgan and his partner were tailed out of the neighborhood by two Subaru vehicles, further causing them fear for their safety. They continued to be under duty to protect each other and fellow federal officers.

When Agent Morgan and his partner were ordered from their normal assignments in the Washington D.C. area, they were prohibited from bringing

their law enforcement vehicles to Minnesota. Instead, Morgan and his partner were required to rent a civilian Ford Expedition, the same as any other citizen would rent. This rental vehicle was devoid of any law enforcement equipment or markings: no obvious or even undercover police blue/red lights, no intercom, no spotlight, no law enforcement decals, no siren. Nothing. It was just a black SUV with out of state license plates: the exact type of vehicle that citizens in the community were suspecting to be undercover ICE vehicles and deciding to target. This is the vehicle that Agent Morgan operated on February 5, 2026.

While trying to regroup and safely reunite at the Air Force Reserve base to continue on working with their team, and as Agent Morgan and his partner were still under order to protect each other and their law enforcement team, the driver of a Cadillac sedan intentionally, aggressively, and dangerously swerved in front of the unmarked rental vehicle that officer Morgan was driving and his partner was a passenger in. The second swerve from the Cadillac, which was targeting Agent Morgan's vehicle, was so dangerous that it nearly caused a rear end collision with Agent Morgan and his partner. Because of the multiple, aggressive and dangerous swerves and braking by the Cadillac driver, Agent Morgan feared for his safety, the safety of his partner in the vehicle, and others on the road. While alongside the Cadillac, Agent Morgan yelled words to the effect of "Police, Stop, back off!" and brandished his service weapon to identify himself as

6

law enforcement and to assure that the Cadillac did not again make any additional dangerous, aggressive moves at or near Morgan and his partner. After the threat from the Cadillac appeared to be over, Agent Morgan peacefully merged into the lane of traffic and continued to follow orders to safely regroup with his team at the Air Force Reserve base and continue their federal operations.

Because ICE had required Agent Morgan to operate a rental vehicle with no law enforcement equipment, he employed available means of identifying himself as a federal law enforcement officer while at the same time brandishing his service pistol and rapidly deterring the Cadillac driver to stop his or her dangerous behavior directed at Morgan and his partner so Agent Morgan and his partner could continue their federal duties.

The State concluded that Agent Morgan committed Assault in the Second Degree—Dangerous Weapon because he purportedly pointed (or brandished) his service weapon, charging Agent Morgan[3] with two counts—one for each occupant of the Cadillac sedan—in violation of Minn. Stat. Sec. 609.222, subd. 1. Ex A. Agent Morgan cooperated with the process, turned in for booking, posted bond, and made his initial appearance and was arraigned on May 22, 2026. Exs. D, F, G, and H.

---

[3] Despite law enforcement conducting interviews of all parties the day after the alleged incident, and having fully identified Morgan, the State waited two months to charge him. Rather than issuing a summons, the Hennepin County Attorney sought a nationwide warrant for his arrest.

Agent Morgan denies and reserves the right to dispute the allegations against him,[4] and asserts that at all relevant times he was acting as a federal officer under color of his office, and that he has a colorable federal defense to the charges against him: immunity under the Supremacy Clause of the United States Constitution. Accordingly, Agent Morgan has the right to have his case heard in federal court.

Because Agent Morgan was providing immediate assistance to another ICE agent who was threatened with bodily harm which arose out of the duty to enforce federal law, and intends to raise a defense that his actions were necessary and proper in the performance of his federal duties, he is entitled to have this case heard in federal court. Agent Morgan asserts defenses including but not limited to Supremacy Clause immunity, official duty self-defense (implicating federal law), official duty defense of another (implicating federal law), applicable ICE Use of Force policy (which does *not* require a duty to retreat in contradiction to Minnesota state law), and official duty necessity (implicating federal law). In the context of the relevant events, some of these defenses are a subspecies of the broader immunity defense. Agent Morgan specifically avers that he was authorized to do what he is charged with, whether it be by brandishing or, for

---

[4] "It was settled long ago that the federal officer, in order to secure removal, need not admit that he actually committed the charged offenses." *Willingham v. Morgan*, 395 U.S. 402, 408 (1969) (citing *Maryland v. Soper*, 270 U.S. 9, 32-33 (1926)).

8

the sake of argument, even pointing his service pistol. The actions of Agent

Morgan on February 5, 2026 were in performance of an act that federal law

authorized him to undertake, and in performing those authorized acts, he did no

more than what was necessary and proper to do. He subjectively believed that

his actions were appropriate to carry out federal duties, and his belief was

objectively reasonable under the circumstances.

I.   **GROUNDS FOR FEDERAL OFFICER REMOVAL UNDER 28 U.S.C. SEC. 1442**

### A. Removal Generally

Congress long ago decided that federal officers should not be subject to

prosecution in state court for acts that occurred while they were operating within

the scope of their federal employment; the removal statute accomplishes that

goal. 28 U.S.C. § 1442(a)(1); *see also Willingham v. Morgan,* 395 U.S. 402, 407 (1969)

(discussing that removal statute is broad enough to cover all cases where federal

officers can raise a colorable defense arising out of their duties to enforce federal

law); *Tennessee v. Davis,* 100 U.S. 257, 263 (1880) (discussing constitutional and

policy reasons necessitating removal to federal court). The federal removal

statute permits removal of any "criminal prosecution that is commenced in a

State court" against "any officer . . . of the United States or the agency thereof, in

an official or individual capacity, for or relating to any act under color of such

office or on account of any right, title or authority claimed under any Act of

9

Congress for the apprehension or punishment of criminals or the collection of the revenue." 28 U.S.C. § 1442(a)(1). The statute "grant[s] district court jurisdiction over cases in which a federal officer is a defendant." *Mesa v. California*, 489 U.S. 121, 136 (1989).

The statute makes clear that "the right of removal under 28 U.S.C. § 1442(a)(1) is made absolute whenever a suit in a state court is for any act 'under color' of federal office, regardless of whether the suit could originally have been brought in a federal court." *Willingham*, 395 U.S. at 406. "To qualify for removal, an officer of the federal courts must both raise a colorable federal defense, and establish that the suit is for a[n] act under color of office [.] To satisfy the latter requirement, the officer must show a nexus, a causal connection between the charged conduct and asserted official authority." *Jefferson County, Ala. v. Acker*, 527 U.S. 423, 431 (1999) (internal citations omitted/cleaned up).

For removal to be proper, the officer need not prove that his federal defense will be successful, only that it be "colorable." *Acker*, 527 U.S. at 431. "For a defense to be considered colorable, it need only be plausible; § 1442(a)(1) does not require a court to hold that a defense will be successful before removal is appropriate." *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001). This Court must credit the federal officer's theory of the case when considering whether he has satisfied the jurisdictional elements. *Acker*, 527 U.S. at 432.

10

The statute sets out a clear procedure for evaluating a removal notice. This Court must promptly examine the notice to ensure "it clearly appears on the face of the notice and any exhibits annexed thereto" that removal is proper. 28 U.S.C. § 1455(b)(4). In other words, the notice must make clear that the defendant (1) was acting in his official capacity; and (2) has a federal defense.

If the United States district court does not order the summary remand of such prosecution, it shall order an evidentiary hearing to be held promptly and, after such hearing, shall make such disposition of the prosecution as justice shall require. If the United States district court determines that removal shall be permitted, it shall so notify the State court in which prosecution is pending, which shall proceed no further. 28 U.S.C. § 1455(b)(5).

Agent Morgan requests that this Court find that removal is proper on the face of this Notice and promptly schedule an evidentiary hearing.

### B. Removal is Proper

Removal is proper in this case because Agent Morgan was acting "under color of his office" and has a "colorable" federal defense. *Acker,* 527 U.S. at 431. Importantly, while Agent Morgan must make a preliminary showing that he has such a defense, he need not "'win his case before he can have it removed.'" *Id.* (citation omitted). This Court must credit Agent Morgan's theory of the case when evaluating the jurisdictional elements. *Id.* at 432.

11

The reason for the removal is to ensure that Agent Morgan's defense of federal immunity is heard in federal court. *Id.* The three elements for removal are met here.

### 1. Agent Morgan is Federal Officer

First, Agent Morgan is an Officer of the United States. There is no dispute that Agent Morgan is a sworn federal law enforcement officer employed by ICE/ERO, a component agency of the United States Department of Homeland Security. He was detailed to the Minneapolis area on official federal business at the time of the incident, February 5, 2026. Agent Morgan is an officer of the United States within the meaning of 28 U.S.C. § 1442(a)(1).

### 2. Agent Morgan Was Acting Under Color of his Office

Second, Agent Morgan was acting "under color of his office."
28 U.S.C. § 1442(c) provides, in pertinent part:

Solely for purposes of determining the propriety of removal under subsection (a), a law enforcement officer, who is the defendant in a criminal prosecution, shall be deemed to have been acting under the color of his office if the officer—

(1) protected an individual in the presence of the officer from a crime of violence;

(2) provided immediate assistance to an individual who suffered, or who was threatened with, bodily harm

Removal requires only that "his acts or his presence at the place in performance of his official duty constitute the basis, though mistaken or false, of the state prosecution." *Maryland v. Soper*, 270 U.S. 9, 33 (1926). Agent Morgan was executing a direct supervisory order under official duties to extract his federal team from an active federal enforcement operation in a hostile neighborhood, protect each other, and to assure their safe regroup to the Air Force Reserve base when the charged conduct occurred. The Cadillac driver intentionally swerved — twice — and applied its brakes hard at Agent Morgan's vehicle, nearly causing a dangerous crash on the highway. Agent Morgan was driving the rented vehicle ICE required him to operate, with his ICE agent partner in the vehicle with him, while wearing his police vest. He had his service weapon issued by ICE. The charged conduct — drawing his service weapon and verbally identifying as law enforcement — arose directly and entirely from his federal role. He protected himself and his ICE partner from a crime of violence and provided immediate assistance to his partner who was threatened with bodily harm. Nothing more is required. *See Id.*

### 3. Agent Morgan Has a Colorable Federal Defense.

Third, Agent Morgan has a colorable federal defense. Agent Morgan intends to assert federal immunity under the Supremacy Clause of the United States Constitution, among other defenses cited above.

"Under *Neagle*, a state court has no jurisdiction if (1) the federal agent was performing an act which he was authorized to do by the law of the United States and (2) in performing that authorized act, the federal agent did no more than what was necessary and proper for him to do." *Kentucky v. Long,* 837 F.2d 727, 744 (6th Cir. 1988); *see also California v. Dotson,* No. 12CR0917 AJB, 2012 WL 1904467, at *2 (S.D. Cal. May 25, 2012).

### a. Agent Morgan Acted Within Course and Scope of His Authority

Agent Morgan intends to prove that he was acting within the scope of his authority when the charged incident occurred. He is authorized and required to drive the rented ICE vehicle, to work with his partner and to drive him, to effect ICE operations in the Twin Cities Area during metro surge, including but not limited to surveillance, protection of ICE and other federal agents, and moving from neighborhood to neighborhood as well as back and forth from the Air Force Reserve base to regroup and continue operations. Their orders required fluid movements every day, from neighborhood to base, back to another neighborhood to base, with frequent diversions being ordered over their radios. From day one of their arrival in Minnesota, Agent Morgan and his team were warned of the danger posed to ICE agents and to protect each other during all operations.

14

As a sworn federal officer, Agent Morgan was authorized to carry and display his service weapon, to identify himself as a law enforcement officer, and to take reasonable steps to protect himself and his partner in the performance of their federal duties when necessary to accomplish and ensure their safety while being ordered to complete a tactical withdrawal and assure their safety while they regroup and continue operating. His training included no duty to retreat. The Eighth Circuit has confirmed that the colorable defense standard does not require the officer to prove that his actions were in fact authorized — only that it is plausible that they were. *Todd,* 245 F.3d at 693. Agent Morgan's display of his service weapon and verbal identification as law enforcement in response to a perceived threat while executing a supervisory extraction order and assure their safety while he and his partner operate and regroup plainly falls within the scope of authority possessed by a federal law enforcement officer.

### b. Agent Morgan's Actions Were Necessary and Proper

"For a federal employee to be stripped of the Supremacy Clause immunity it must be shown that the employee employed means which he cannot honestly consider reasonable in discharging his duties or that the act was made out of malice or with criminal intent." *Dotson,* 2012 WL 1904467, at *3 (citing *Clifton,* 549 F.2d at 728).

15

To be necessary and proper, an officer must (1) subjectively believe that his action is justified; and (2) that belief must be objectively reasonable. *See Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir. 1977) (citing *Cunningham v. Neagle*, 10 S.Ct. 658 (1890); *see also New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004). Critically, a defendant need not "show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Clifton*, 549 F.2d at 728.

Both conditions are met here. Agent Morgan subjectively believed his actions were justified based on the following facts: (1) his team had experienced active, escalating hostility throughout their operation that day, including being surrounded, threatened and followed by individuals in and then out of the operational area; (2) approximately one hour before the Cadillac incident, a Jeep Cherokee had swerved at Agent Morgan's vehicle in what he perceived as another targeted act against his team, and he had been required to identify himself as law enforcement during that incident; (3) the Cadillac targeted Morgan's unmarked vehicle by intentionally swerving into his path at least *twice* — without any provocation from Agent Morgan — and aggressively applied its brakes, nearly causing a rear end collision or running Morgan off the road, and created a threat of imminent bodily harm to Agent Morgan, his ICE Partner, and perhaps other motorists — conduct that Agent Morgan reasonably perceived as additional targeted hostility toward himself and his partner, like they had

16

already experienced that day. The Cadillac's intentional actions were so aggressive that if they continued and sideswiped the ICE rental vehicle, great bodily harm may have occurred to Agent Morgan, his partner, occupants of the Cadillac, or other motorists on the busy highway; (4) Agent Morgan had a duty to continue to protect himself and his ICE partner as they tactically withdrew and attempted to safely regroup with their team (that he and his partner had been separated from) at the Air Force Reserve base; and (5) ICE had provided Agent Morgan with a vehicle that had no law enforcement markings, law enforcement lights, sirens, spotlight, or intercom equipment, leaving him with few options of identifying himself as a federal officer and deterring the Cadillac driver's assaultive actions in a rapidly developing and increasingly dangerous situation. In fact, the driver of the Cadillac admits that he/she "made the not so bright decision and tried to stop (Morgan)." The Cadillac driver also admitted Agent Morgan "was yelling something" but couldn't make out what Agent Morgan was saying because the Cadillac's windows were up.

Agent Morgan's belief was also objectively reasonable. He was an ICE/ERO agent executing a direct supervisory order to extract from an active operational area where his team had been subjected to ongoing, escalating hostility, and to get himself and his law enforcement partner safely back to the Air Force Reserve base. He was operating in an unmarked rental vehicle — not

17

by personal choice but because ICE required it. This rental vehicle was just a normal rental vehicle that any civilian would rent. This deprived Agent Morgan of the ability to put on red/blue lights, order the Cadillac driver to cease over the intercom, flash a spotlight, identify as police with conspicuous markings on the doors, etc. These facts further constrained the way in which officer Morgan was able to carry out his duties. And because the Cadillac driver swerved at least twice, its conduct was clearly threatening to Agent Morgan.

Additionally, Agent Morgan and his partner were separated from their team during the tactical extraction operation, and had been followed out of the neighborhood by two civilian Subaru vehicles. They had already encountered one hostile civilian Jeep that day in nearly identical circumstances. When the Cadillac twice swerved in front of him and then aggressively applied its brakes directly in front of Morgan's vehicle, the circumstances as they appeared to Agent Morgan supported a reasonable belief that another hostile act against his federal team was underway.

Because ICE required use of an unmarked rental vehicle with no lights, sirens, or intercom, displaying the service weapon in conjunction with a clear verbal identification—'Police, Stop'—was his available method to deter an imminent vehicular threat and communicate lawful authority. It was known to Agent Morgan and his partner that many hostile community members were

18

targeting nearly identical unmarked, rented ICE vehicles by crowd sourcing their information, especially black SUV's with out of state license plates. Whether or not the Cadillac driver was part of a crowd sourcing situation or not, the targeted and threatening driving conduct put Agent Morgan and his partner in danger of imminent bodily harm while they were acting in the color and scope of their federal duties and authority.

## II.  THIS CASE IS DISTINGUISHABLE FROM CASES DENYING REMOVAL

The State may rely on *Minnesota v. Weber*, 589 F. Supp. 2d 1170 (D. Minn. 2008), *North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990), and *North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir. 1991), to argue that removal is improper. Those cases are factually distinguishable in critical respects.

*Weber* arose in this district. But *Weber* involved a Border Patrol agent on a routine patrol who "conceded at the evidentiary hearing that there are no facts in the record sufficient to establish an 'exigency or emergency.'" *Weber*, 589 F. Supp. 2d at 1174. There was no active operation, no supervisory directive, no hostile threat, no team extraction, and no duty-related constraint on the agent's conduct. The agent was simply patrolling a road. *Id.* at 1171-72. Agent Morgan's situation is the opposite. He was executing a direct supervisory order to extract his team

19

from an active operational area under hostile conditions with limited equipment. The exigency here is not manufactured — it is documented in the record.

*Ivory* and *Cisneros* both involved military convoy drivers with no duty-related exigency requiring their specific conduct. In *Ivory*, the Marine was returning from a routine transport with no emergency and no order prohibiting him from stopping to yield the right of way. *Ivory*, 906 F.2d at 1003. In *Cisneros*, the alleged exigency — brake failure — was not "the type which inheres in the very nature and object of the federal duty at issue." *Cisneros*, 947 F.2d at 1140. Neither case involved an agent executing a supervisory tactical withdrawal, separated from his team, operating in a vehicle that his agency required him to use despite having no law enforcement equipment, and responding to what he reasonably perceived as a targeted hostile act increasing the exigency.

This case aligns instead with cases where removal was properly granted. In *California v. Dotson*, the court granted removal where a federal agent was conducting active drug surveillance when the charged conduct occurred, finding defendant's actions were within the scope of the federal authority, necessary and proper, and dismissing the charge on Supremacy Clause immunity. *Dotson*, 2012 WL 1904467, at *4-7. In *United States v. Landis*, No. 6:23-cr-00330-MC (D. Or. 2023), removal was granted where a DEA agent was conducting active fentanyl surveillance when involved in an accident. Here, as in those cases, there is a

20

direct and meaningful connection between Agent Morgan's charged conduct and his federal law enforcement duties — not merely the coincidence of being on duty.

Agent Morgan's decision to display his service weapon, identify himself as law enforcement, and warn the Cadillac occupants arose directly from: (1) a supervisory order to extract from a hostile operational area, protect each other, and safely regroup with his team at the Air Force Reserve base while still under duty; (2) active, ongoing hostility toward his federal team that day; (3) the operational requirement to use an unmarked rental vehicle with no law enforcement equipment; and (4) his reasonable perception that the Cadillac's assaultive driving conduct was targeted at these agents, placing Agent Morgan and his partner in a position of imminent bodily harm. The "law enforcement urgency" is not merely background context — it was the direct cause of the conduct now charged.

In an interview to the State Trooper investigating this matter, Agent Morgan's partner confirmed that Agent Morgan was wearing his police vest at the time of this incident and that Agent Morgan was yelling "police, stop!" At all times during this dangerous encounter with the Cadillac, Agent Morgan and his partner were still under active enforcement operations, during performance of their duties and as part of the exercise of this official authority, being required to

21

extract from a dangerous situation, continue to protect one another in the hostile environment, and safely regroup back at the Air Force Reserve base, where they remained on duty and engaged in the performance of their official federal duties for approximately two hours *after* this incident, contrary to the allegations in the criminal complaint. This brandishing of his service weapon in response to an immediately perceived threat by a twice-swerving and hard braking Cadillac was a defensive response necessary to make federal enforcement effective, and was in accordance with ICE Use of Force policy, as well as in valid self-defense and defense of his federal law enforcement partner. This was a duty-constrained emergency/exigency that arose after the intentional, aggressive behavior of the Cadillac without any provocation from Agent Morgan.[5] Agent Morgan honestly and reasonably believed he and his partner were in danger of imminent bodily harm.[6] This action involved not only protecting himself but protecting another federal official, and this minimal use of force and warning was a necessary and proper incident of that federally authorized act.

Agent Morgan denies the charges and reserves the right to dispute the allegations against him, and asserts that at all relevant times he was acting as a

---

[5] The Cadillac driver admitted his/her driving conduct was intentional.

[6] Minnesota law recognizes a vehicle can be a "dangerous weapon" for purposes of state assault statutes. See, e.g., *State v. Jones*, 2022 WL 4074794 at *3 (Minn. Ct. App. September 6, 2022) (citing to cases where vehicle is a dangerous weapon); *State v. Bakdash*, 830 N.W.2d 906 (2013); *Mell v. Commissioner of Public Safety*, 757 N.W.2d 702 (2008), and *State v. Greyeagle*, No. A19-550 2020 WL 4932838 (Minn. Ct. App. August 24, 2020 (unpublished) (holding no actual contact necessary for conviction of second degree assault using vehicle as dangerous weapon).

federal officer, under color of his office, and that he has a colorable federal defense to the charges against him as referred to above.

Accordingly, Agent Morgan has the right to have this case heard in federal court.

## CONCLUSION

Because it does not clearly appear on the face of this Notice that removal is improper, Defendant requests the Court accepts jurisdiction over this matter, proceed under § 1455(b)(5) and set an evidentiary hearing to make such disposition of the prosecution as justice shall require. § 1455(b)(4) directs the Court to summarily remand only if it "clearly appears" removal is improper; otherwise, § 1455(b)(5) authorizes an evidentiary hearing.

Promptly after filing this Notice, Defendant will serve all adverse parties and file a copy of this Notice with the Clerk of the Hennepin County District Court, Fourth Judicial District, which shall effect removal under § 1455(b)(1). Proof of such service and filing will be lodged with this Court.

23

Respectfully submitted,

**PACYGA TRIAL LAWYERS**

Dated: June 9, 2026

By: /s/ Ryan M. Pacyga
Ryan M. Pacyga (#321576)
860 Blue Gentian Rd.
Suite 175
St. Paul, MN 55121
612-339-5844 (phone)
E-mail: Ryan@ArrestedMN.com
*Attorney for Gregory Donnell Morgan, Jr.*

24